**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
UNITED STATES OF AMERICA,               :
                                        :    Civ. No. 14-3055 (FLW)
                    Petitioner,         :
                                        :
         v.                             :          **OPINION**
                                        :
ELI CHABOT *and*                        :
RENEE CHABOT,                           :
                                        :
                    Respondents.        :
_____:

**WOLFSON, U.S. DISTRICT JUDGE:**

Before the Court is United States of America's ("Government") petition to enforce an Internal Revenue Service ("IRS") summons compelling Eli and Renee Chabot ("the Chabots" or "Respondent") to produce all documents concerning any foreign bank accounts that were required to be maintained by the Bank Secrecy Act of 1970 ("BSA") and regulations under that Act. For the following reasons, the Government's petition is GRANTED.

### I.      Background

On or around April 6, 2010, the IRS received information from the French competent authority pursuant to the United States-France income tax treaty that provided "information concerning U.S. Persons maintaining undisclosed bank accounts at HSBC bank."  Danilack Declaration, at ¶¶ 3, 5-6.  The IRS claims it has information regarding Pelsa Business Inc. ("Pelsa") accounts at HSBC for the years 2005 – 2007 and that according to the information provided, Eli Chabot is the beneficial owner of Pelsa.  *Id.*  at ¶¶ 7-8. On March 12, 2012, the IRS issued an administrative summons requesting that the Chabots appear to testify. On May 12, 2012, the Chabots appeared

and, on the advice of counsel, asserted their Fifth Amendment privilege and refused to answer any IRS questions about foreign bank accounts. Gratsy Declaration, at ¶ 5.

On June 20, 2012, the IRS issued another summons to Eli Chabot and one to Renee Chabot. The summons requested both parties to appear on July 13, 2012 to give testimony and produce extensive documents about foreign bank accounts for the period January 1, 2006 to December 31, 2009. *Id.* at ¶¶ 7, 10; *see also* Eli Chabot Summons, Renee Chabot Summons. On July 13, 2012, the Chabots' counsel advised the IRS that the Chabots would not appear, were asserting their Fifth Amendment privilege, and declined to produce the requested documents. *Id.* at ¶ 12, Ex. 3. On November 16, 2012, the IRS amended its summons, narrowing the scope of the information sought to request only those documents required to be maintained by 31 C.F.R. § 1010.420 ("Section 1010.420"). *Id.* at ¶ 13; Pet. To Enforce Summons, at ¶ 8. The Chabots continued to assert their privilege.

On May 14, 2014, the IRS filed a petition to enforce the November 16th summons. *See* Pet. To Enforce Summons. On May 19, 2014, this Court entered an Order to Show Cause, which was adjourned by consent until September 22, 2014. The Order to Show Cause directed Respondents to present any defense or opposition to the petition to enforce the summons.

In their written response, Respondents assert the Fifth Amendment Act of Production Privilege and claim that the Required Records Doctrine, which precludes assertion of the Fifth Amendment privilege, does not apply. The Government replied and urges this Court to adopt the reasoning of six federal courts of appeal in finding that foreign bank account information requested under the Bank Secrecy Act, including under 31 C.F.R. § 1010.420, falls within the Required Records Doctrine. The Third Circuit has not yet ruled on this issue.

On September 22, 2014, this Court held a hearing on its Order to Show Cause and reserved its decision. This Opinion follows.

## II.    Standard of Review

The Fifth Amendment of the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. U.S. Const. Amend. 5. The Supreme Court has clarified that the privilege extends to the act of producing potentially incriminating documents. *Fisher v. United States*, 425 U.S. 391 (1976) ("The act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced."); *see also United States v. Hubbell*, 530 U.S. 27 (2000).

The Required Records Doctrine was first articulated in *Shapiro v. United States*, 335 U.S. 1 (1948).  Viewed by some courts as an exception to the Fifth Amendment privilege and by others as a "threshold inquiry to determine whether the privilege attaches in the first place," *see In re Special February 11-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d 903 (7th Cir. 2012) ("Special February Grand Jury Subpoena"),[1] the doctrine prevents individuals, who possess records the Government requires them to maintain as a result of voluntary participation in certain regulated activities, from asserting their Fifth Amendment privilege.  *Shapiro*, 335 U.S. at 33.[2] In a subsequent decision, the Court specified three "premises," or factors, in determining whether the Required Records Doctrine applies: "first, the purposes of the United States' inquiry must be

---

[1] The Third Circuit has not explicitly ruled on whether the Required Records Doctrine is an exception to the Fifth Amendment privilege. Nonetheless, the circuit has recognized that the doctrine places certain records and filings "outside the prohibition against compulsory self-incrimination." *U.S. v. Buck*, 730 F.2d 129, 132 (3d Cir. 1984).

[2] *Shapiro* cautions "that there are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be . . . used in prosecuting statutory violations committed by the record-keeper himself." 335 U.S. at 32. However, Respondents do not argue that the Bank Secrecy Act exceeds those limits. Further, the Constitution explicitly allows Congress to "regulate Commerce with Foreign Nations, a category into which offshore banking falls." U.S. Const. art. I, § 8, cl. 3.

essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." *Grosso v. United States*, 390 U.S. 62, 67-68 (1968).[3]

The Bank Secrecy Act of 1970 ("BSA") regulates offshore banking, and identifies as its purpose "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. Under Section 241(a) of the Act, which requires U.S. citizens to "keep records and file reports" of their foreign financial transactions and relationships, the Treasury Department promulgated regulations requiring U.S. citizens with foreign bank accounts to disclose their foreign bank accounts in the form of what is called a foreign bank account report ("FBAR"). 31 C.F.R. § 1010.350. If the citizen possesses, otherwise has a financial interest in, or has signatory authority over such accounts, she must retain the records of such accounts for at least five years, to be kept "available for inspection as authorized by law." *Id.* 1010.420. Failure to file an FBAR is a felony under 31 U.S.C. § 5322.

## III.    Analysis

Respondents argue that, under the three-pronged test articulated in *Grosso*, (1) Section 1010.420 does not literally require that records be kept, only that information be "retained" and, to the extent it does require records, it is essentially criminal, not regulatory; (2) the information sought is not "customarily kept" by foreign account holders and beneficiaries, especially those in "secrecy" jurisdictions; and (3) the bank records in question, to the extent they exist, are private,

---

[3] Some circuit courts view the three "premises" as requirements. *See Special February Grand Jury Subpoena*, 691 F.3d at 906. Other courts view the test articulated in *Grosso* as more flexible. *See In Re Grand Jury Subpoena*, 696 F.3d 428, 433 (5th Cir. 2012) ("Although the Fifth Circuit has applied the first and third prongs of the Required Records Doctrine, it has not applied the second prong . . . ."). The Third Circuit has not yet taken a position on this issue.

informally recorded, and cannot reasonably be said to have a "public aspect." Further, Respondents contend that the required records doctrine should not be extended to a situation such as the present one, in which "the nexus between the recordkeeping requirement and the potential crime is so connected."[4] Resp. Brief at 26.

The Third Circuit has not yet decided whether the documents sought in a summons for foreign bank account information under Section 1010.420 fall within the Required Records Doctrine. However, the Second, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits have all reached the issue and found that the Required Records Doctrine applies. *See In re Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d 339 (2d Cir. 2013); *U.S. v. Under Seal*, 737 F.3d 330 (4th Cir. 2013); *In re Grand Jury Proceedings*, 707 F.3d 1262 (11th Cir. 2013); *In re Grand Jury Subpoena*, 696 F.3d 428 (5th Cir. 2012); *Special February Grand Jury Subpoena*, 691 F.3d 903 (7th Cir. 2012); *In re M.H.*, 648 F.3d 1067 (9th Cir. 2011), cert denied sub. nom. *M.H. v. U.S.*, 133 S.Ct. 26 (2012). The Government contends that the arguments found persuasive by these other circuit courts should convince this Court, as well. In contrast, Respondents assert that these decisions (1) do not control this Court, (1) are incorrectly decided, and (3) are distinguishable on the facts.

A. *Three-pronged Test*

1. *"Essentially Regulatory"*

The Supreme Court has noted that in those cases where the Fifth Amendment privilege was found to protect against statutory disclosures, "the disclosures condemned were only those extracted from a highly selective group inherently suspect of criminal activities and the privilege

---

[4] For purposes of these proceedings, Respondents do not contest that the Government has met its burden of proof under *U.S. v. Powell*, 379 U.S. 48 (1964) to establish a *prima facie* case for issuing a summons in good faith—by showing that (1) "the investigation will be conducted pursuant to a legitimate purpose," (2) "the inquiry may be relevant to the purpose," (3) "the information sought is not already within the IRS's possession," and (4) "the administrative steps required by the Internal Revenue Code have been followed." *U.S. v. Clarke*, 134 S.Ct. 2361 (2014) (quoting *Powell*, 379 U.S. at 57-58); *see also* Gratsky Decl. at ¶¶ 9-12.

was applied only in an area permeated with criminal statutes—not in an essentially noncriminal and regulatory area of inquiry." *California v. Byers*, 402 U.S. 424, 430 (1971).

Respondents argue that Section 1010.420 only requires that five items of information "shall be retained" and "be kept at all times available for inspection," which, when read literally, does not necessarily require the keeping of records. However, Respondents cite no textual support for this proposition. The Government points to Section 1010.420's text to belie Respondent's argument. Section 1010.420 states:

> *Records* of accounts required by § 1010.350 to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account. Such *records* shall contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period. Such *records* shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law.

31 C.F.R. § 1010.420 (emphasis added).[5]

Respondents further argue that Section 1010.420's requirements, when read in isolation from the rest of the BSA, are essentially criminal because Section 1010.420 (1) requires records to be retained for five years, which parallels the five-year statute of limitations for federal non-capital crimes, and (2) is administered by a self-proclaimed criminal enforcement agency, the Financial Crimes Enforcement Network ("FinCEN").[6] Respondents cite to *Marchetti*, *Grosso*, *Leary*, and

---

[5] Additional arguments regarding whether the information sought constitutes "records" are analyzed in the second prong of the *Grosso* test. *See infra* at 11.

[6] Additionally, Respondents cursorily argue that "[a]ny averment by the IRS that the information collected from FBARs and/or collected pursuant to 1010.420 is used for essentially regulatory purposes should be the subject of a hearing pursuant to the teaching of *United States v. Clarke*." 134 S.Ct. 2361 (2014). Basically, Respondents attach a bad faith motive to the IRS for taking the position that Section 1010.420 is "essentially regulatory" to support the IRS summons here. However, Respondents offer no specific facts that would support an inference of bad faith on the part of the IRS. *Clarke*, 134 S.Ct. at 2365 (The taxpayer only "has a right to question IRS officials about their reasons for issuing a summons . . . . when he points to specific facts or circumstances plausibly raising an inference of bad faith."). Further, Respondents conceded at the hearing that it did not intend to pursue an evidentiary hearing.

*Haynes*, all cases in which the Supreme Court found the Fifth Amendment privilege to apply because the statutes in question targeted inherently illegal activity.[7]

However, all six circuit courts have found that the BSA is essentially regulatory, not criminal, in nature, and does not exceed constitutional limits it its regulation. For one, the statute targets a group of individuals not necessarily engaging in illegal activity, distinguishing these facts from those in *Marchetti*, *Grosso*, *Leary*, and *Haynes*. *In re M.H.*, 648 F.3d at 1074 ("There is nothing inherently illegal about having or being a beneficiary of an offshore foreign bank account."); *see also Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d at 348. Second, the information sought under the statute is used for a variety of purposes, not just for criminal prosecution. *Id.* ("[T]his multifaceted statute clearly contributes to civil and intelligence efforts wholly unrelated to any criminal purpose."); *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 76–77 (1974) (In the BSA, "Congress seems to have been equally concerned with civil liability which might go undetected by reason of transactions of the type required to be recorded or reported."); *Grand Jury Proceedings*, 707 F.3d at 1271 ("[T]he Treasury Department shares the information it collects pursuant to the Act's requirements with other agencies . . . none of which are empowered to bring criminal prosecutions."); *see also* 31 U.S.C. § 5311.

Further, the Government argues—and this Court agrees—that Section 1010.420 in particular has both criminal and civil purposes.[8] First, the disclosure requirements assist the IRS in gathering

---

[7] The statutes at issue in these four cases imposed the following requirements: (1) in *Marchetti* and *Grosso*, a tax on wagering, which was virtually banned at the time; (2) in *Haynes*, the registration of illegal firearms; and (3) in *Leary*, registering marijuana traffickers. *Marchetti v. United States*, 390 U.S. 39, 47 (1968); *Grosso*, 390 U.S. at 64; *Haynes v. United States*, 390 U.S. 85, 96 (1968); and *Leary v. United States*, 395 U.S. 6, 16, 18 (1969).

[8] It is not even clearly necessary to read Section 1010.420 apart from the BSA to determine whether the law at issue is essentially criminal or regulatory. Other circuits have only generally analyzed the underlying statute. *See, e.g.*, *In re Grand Jury Subpoena To Custodian of Records,* 497 F.2d 218, 220 (6th Cir. 1974), *cert. denied,* 419 U.S. 1009 (statute should be read "as a whole" to determine whether regulatory in nature); *see also In re Grand Jury Subpoena Duces Tecum Served Upon Underhill*, 781 F.2d 64, 67 (6th Cir. 1986) ("Although the specific provisions

evidence of undetected civil liability. Second, the regulation at its core seeks basic information about the plausibly innocuous activity of maintaining a foreign bank account. Other district courts have held similarly. *See, e.g.*, *In re Grand Jury Subpoena Dated February 2, 2012*, 908 F. Supp. 2d 348, 355 (E.D.N.Y. 2012) *aff'd*, 741 F.3d 339 (2d Cir. 2013) ("Because the record-keeping requirements of 31 C.F.R. § 1010.420 do not target inherently illegal activity, the provision is essentially regulatory in nature."). Third, as the Second Circuit aptly notes, the fact that FinCEN uses Section 1010.420, a "multi-purposed statute" for criminal enforcement purposes "is neither surprising nor persuasive," and does not change the conclusion that the regulation is essentially regulatory.

Respondents next argue that the other circuits that have considered this issue have ruled incorrectly because they failed to focus on the close connection between the disclosure under Section 1010.420 and the potential crime at issue (i.e., willful failure to file an FBAR under Section 1010.350 of the same statute). Respondents argue that because responding to the IRS's summons may essentially result in admitting to a FBAR violation, they would be potentially forced to admit an element of the crime. Respondents cite to extra-circuit cases involving the attorney-client privilege. *See Baird v. Koerner*, 279 F.2d 623, 633 (9th Cir. 1960) (finding that privilege applied when the disclosure of the client's name would implicate the client in a crime); *Tillotson v. Boughner*, 350 F.2d 663 (7th Cir. 1965) (finding that privilege applies when "disclosure of the identity of the client . . . would lead ultimately to disclosure of the taxpayer's motive for seeking legal advice").

---

of the Act and the regulations . . . may have criminal application, these provisions serve the overall purpose of enforcement of an essentially regulatory program.").  The Third Circuit has not yet addressed this issue.
.

Respondents' arguments do not hold sway here. First, in order to establish that Respondents have violated the BSA, the Government would have to prove that Respondents acted *willfully*. "That fact distinguishes this case from *Marchetti* and *Grosso*, where the activity being regulated— gambling—was almost universally illegal, so that paying a tax on gambling wagers necessarily implicated a person in criminal activity. Admitting to having a foreign bank account carries no such risk. "That the information contained in the required record may ultimately lead to criminal charges does not convert an essentially regulatory regulation into a criminal one." *In re M.H.*, 648 F.3d at 1074-75; *see also Grand Jury Subpoena dated February 2, 2012*, 741 F.3d at 352 ("[A]n account owner who was truly unaware of the recordkeeping requirement would not incur related criminal sanctions by acknowledging in response to a production order his negligent failure to maintain the required record.").

At the September 22nd hearing, Respondents also attempted to distinguish the facts of this case from the six appellate courts which have considered the applicability of the Required Records Doctrine to records requested under Section 1010.420. Respondents argue that here, while they are subjects of a civil investigation, they have nonetheless been brought in for formal interrogation by the IRS, which can also open a parallel criminal investigation—whereas the appellate courts that have ruled on this issue dealt with individuals who were the targets of grand jury investigations. *See, e.g.*, *M.H.*, 648 F.3d at 1070. Respondents also request the Court to take judicial notice of (1) deferred prosecution agreements between the government and UBS and HSBC that resulted in UBS turning over the account information for "certain United States customers of UBS's cross-border business"[9] as well as (2) transcripts from the May 2, 2012

---

[9] On September 30, 2014, Respondents filed a post-hearing submission elaborating on the significance of the deferred prosecution agreements. Respondents argue that the "certain customers" whose accounts UBS turned over "were inherently those who were suspected of criminal conduct—failure to file an FBAR as required by 31 CFR 1010.350, and made criminal by 31 U.S.C. § 5322." *See* Sept. 30 letter, at 2. Respondents also cite to a DOJ press

meeting between Respondents and the IRS submitted on the eve of the September 22nd hearing. At the hearing, Respondents argued that the interrogations evidenced from the transcripts, taken together with the deferred prosecution agreements and the totality of the circumstances, created an essentially criminal atmosphere for Respondents that meaningfully differed from the atmosphere encountered by the individuals targeted by grand jury investigations in the six appellate cases.

However, Respondents' attempts to distinguish their case from the six appellate cases that have reached this issue are unconvincing. First, at least one district court has addressed the validity of an IRS administrative summons requesting information under Section 1010.420, and found no reason to distinguish the Fifth Amendment jurisprudence examined by the appellate courts. *See U.S. v. Chen*, 952 F.Supp.2d 321, 330-31 (D. Mass. 2013). Second, even if the IRS began civilly investigating Respondents due to information the IRS received from the deferred prosecution agreements, it does not follow that such a fact transforms Section 1010.420, or even the IRS's use of the regulation in this case, into an "essentially criminal" regulation. As has been represented by the IRS here, there is currently no ongoing criminal investigation or one currently contemplated,[10] which, if anything, makes the application of the Required Records Doctrine here *more* compelling than in the six appellate cases, where the prospect of criminal charges loomed larger because the relevant individuals had been issued grand jury subpoenas and were identified as targets of grand jury investigations.[11] Respondents also fail to cite any case law that requires, or even sanctions,

---

release publicizing the deferred prosecution agreement in which the DOJ noted it had "successfully prosecuted six U.S. customers of UBS whose information was provided pursuant to the Deferred Prosecution Agreement, and is conducting investigations of dozens of other UBS customers." *Id.*

[10] However, to be clear, the IRS has not represented that a criminal investigation could never develop from the current civil investigation.

[11] To reiterate, "[t]hat the information contained in the required record may ultimately lead to criminal charges does not convert an essentially regulatory regulation into a criminal one." *In re M.H.*, 648 F.3d at 1074-75.

case-by-case speculation under the Required Records Doctrine about the subjective, long term intention behind each records request issued pursuant to a valid regulatory scheme.[12]

Finally, at the September 22nd hearing, Respondents contended that expanding the Required Records Doctrine to Section 1010.420 and depriving them of the Fifth Amendment protection has the effect of allowing the IRS to administratively summon individuals, question them about whether they have foreign bank accounts, and, if they refuse to answer, make an end run around the Fifth Amendment by asking for records under Section 1010.420. Once the individuals respond with the requested information, the IRS can commence criminal proceedings. Respondents apparently argue against viewing offshore bankers as having "waived" their Fifth Amendment rights by quoting the following dicta in *Marchetti*:

> The constitutional privilege was intended to shield the guilty and imprudent as well as the innocent and foresighted; if such an inference of antecedent choice were alone enough to abrogate the privilege's protection, it would be excluded from the situations in which it has historically been guaranteed, and withheld from those who most require it. Such inferences, bottomed on what must ordinarily be a fiction, have precisely the infirmities which the Court has found in other circumstances in which implied or uninformed waivers of the privilege have been said to have occurred. To give credence to such 'waivers' without the most deliberate examination of the circumstances surrounding them would ultimately license widespread erosion of the privilege through ingeniously drawn legislation.

390 U.S. at 51-52. I find Respondents' reliance on *Marchetti* in this case unpersuasive because this Court has examined the surrounding circumstances and determined that the BSA, including Section 1010.420, does not target a group engaged in inherently criminal activity as was present in *Marchetti*; in *Marchetti*, the underlying statute targeted "wagerers," or gamblers, whose activities were "very widely prohibited under both federal and state law." *Marchetti*, 390 U.S. at 44. *Compare In re Special February 11-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d at 309 ("The voluntary choice to engage in an activity that imposes record-keeping requirements

---

[12] *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Served Upon Underhill*, 781 F.2d at 67.

under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have be turned over upon demand, notwithstanding any Fifth Amendment privilege."). And, again, construing the Required Records Doctrine in this manner does not amount to criminalizing offshore banking. Moreover, it bears emphasizing that compliance with the record keeping requirements of the Act is not incriminating on its face. Compare *Grosso*, 390 U.S. at 66-67, 88, with *Byers*, 402 U.S. at 430-31. "This is not a situation, as petitioners insist, where Congress can completely avoid the Fifth Amendment self-incrimination privilege by simply passing a law that requires a person to keep documents of *illegal* activities and if such records of *illegal* activities are not kept that the same be designated as a crime." Keeping an offshore bank account, like "buying and selling automobiles, is not, in and of itself, an illegal activity." *In re Grand Jury Subpoena Duces Tecum Served Upon Underhill*, 781 F.2d at 69. Therefore, under the *Grosso* test, the BSA—including Section 1010.420—is essentially regulatory.

2.   *"Customarily Kept"*

Next, I consider whether the disclosures sought are of information customarily kept. *Grosso*, 390 U.S. 62, 67-68. Here, Respondents contend that (1) the information sought under Section 1010.420 do not constitute "records";[13] (2) Section 1010.420 applies to individuals who may not even know of the existence of the bank account(s) in question, and therefore would not keep any records to such account(s); and (3) the inherent nature of foreign banking is so secretive that individuals regulated by Section 1010.420 may not ever possess, much less maintain, records required under the regulation.

---

[13] The Government does not respond to the first part of Respondents' argument on this issue, presumably because it already addressed whether information requested under Section 1010.420 constitutes a record.

However, the appellate courts that have already considered this issue have all rejected Respondents' second and third arguments and found that records requested under Section 1010.420 are customarily kept. "The information that § 1010.420 requires to be kept is basic account information that bank customers would customarily keep, in part because they must report it to the IRS every year as part of the IRS's regulation of offshore banking, and in part because they need the information to access their foreign bank accounts." *In re M.H.*, 648 F.3d at 1076. Regarding the argument that foreign banking can be inherently secretive, "even if those who possess foreign bank accounts for the purposes of avoiding some specific U.S. tax or criminal laws may be less likely to maintain these records, the BSA covers the entire group of foreign bank account holders. We decline to look at the custom of only the miscreants among the larger group of foreign bank account holders." *Grand Jury Subpoena Dated February 2, 2012*, 741 F.3d at 350-51. The Court agrees with the existing case law on this issue and finds such basic and easily-accessible account information to be "customarily kept" under *Grosso* and its progeny.

3. *"Publicly Kept"*

The third prong of analysis invites this Court to examine whether the records sought possess a public aspect. *Grosso*, 390 U.S. 62, 67-68. Here, Respondents argue again that the requested information (1) does not constitute a record,[14] because such information can be comprised of hastily scrawled numbers on a napkin and (2) is private, analogous to general taxpayer records. *See Smith v. Reichert*, 35 F.3d 300 (7th Cir. 1994).

First, Respondents' argument that records do not include information such as bank account numbers or amounts held in a bank account is not well-taken. Section 1010.420 states that "records of reports required [to be reported] under Section 1010.350 shall be retained for a period of five

---

[14] Again, the Government does not explicitly address Respondents' arguments that that information under Section 1010.420 are not records.

years and shall be kept at all times available for inspection as required by law." *In re M.H.*, 648 F.3d at 1077; *see also* 31 C.F.R. § 1010.420.  Further, Merriam-Webster defines the verb "record" as "to write (something) down so that it can be used or seen again in the future."[15] Information that is required by law to be annually reported, retained, and kept available for inspection indeed constitutes records—regardless of whether the information can fit on a napkin.

Second, the information sought under Section 1010.420 cannot be considered private under the Required Records Doctrine. *Smith*, which concerned taxpayer records such as W-2s and 1099s, is distinguishable. In fact, *Smith* states, "[t]he hypothetical case in which every individual is required to maintain a record of everything he does that interests the government is remote from the case of the individual who enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agencies is one of the conditions of engaging in that activity."). *See also In re Special February 11-1 Grand Jury Subpoena Dated Sept. 12, 2011*, 691 F.3d 300, 309 (7th Cir. 2012) ("The voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have be turned over upon demand, notwithstanding any Fifth Amendment privilege.").

The Court agrees with the six appellate courts in concluding that because "the personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect." This is especially true because the Treasury Department typically shares the information it collects under BSA regulations such as Section 1010.420 with other agencies, serving "important public purposes sufficient to imbue otherwise private foreign

---

[15] *Record*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/record (last visited Oct. 2, 2014).

bank account records with public aspects." *In re Grand Jury Proceedings, No. 4-10*, 707 F.3d at 1273.

Because the *Grosso* test's premises are met, the Required Records Doctrine applies and Respondents may not claim the Fifth Amendment privilege to refuse responding to the IRS's summons.

## IV.    CONCLUSION

For the reasons stated above, the Court grants the Government's petition to enforce the IRS summons served on Respondents.  An appropriate order shall follow.


Dated:        October 3, 2014

/s/ Freda L. Wolfson

FREDA L. WOLFSON, U.S.D.J.