WARD W. BENSON
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 227
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 514-9642
Email: ward.w.benson@usdoj.gov
*Counsel for the United States of America*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|         Petitioner, | ) Case No. 14-cv-03055 |
| v. | ) |
| ELI CHABOT and<br>RENEE CHABOT, | ) |
|         Respondents. | ) |

**UNITED STATES OF AMERICA'S BRIEF REGARDING PAST STATEMENTS BY ELI CHABOT AND RICHARD LEVINE**

As directed by the Court at the hearing held on August 20, 2019, the United States of America submits the following memorandum identifying statements and representations by respondent Eli Chabot and his counsel, Richard Levine, which appear to be false in the case of Chabot and a violation of an attorney's ethical duties in the case of Mr. Levine. (Aug. 8, 2019 Tr. pp. 25-26). Before addressing these points, however, the United States will address Mr. Levine's recent assertion that he no longer represents Chabot in this matter. Also, before addressing the merits, the United States will correct statements made during the hearing regarding the statute of limitations for the IRS to assess penalties for willful failure to file an FBAR.

## LEVINE'S CURRENT STATUS AS COUNSEL

In a letter to the Court dated September 13, 2019, Chabot's local counsel, Frank Holahan, referred to Mr. Levine as "Mr. Chabot's former co-counsel." (Dkt. No. 148). Since Mr. Levine had not filed a motion to withdraw, as is required for counsel appearing *pro hac vice*, undersigned counsel asked Mr. Holahan for an explanation. L.R. 101(c)(5) ("A lawyer admitted pro hac vice is within the disciplinary jurisdiction of this Court. A lawyer admitted pro hac vice may not withdraw as counsel without leave of this Court before the action is terminated."). Mr. Holahan responded that because the Court had administratively terminated the action by text order on May 31, 2017 (Dkt. No. 99), Mr. Levine was not required to move to withdraw.

The United States strongly contests Mr. Holahan's position on Mr. Levine's status in this case. An administrative termination of an action in which a contempt order remains valid and sanctions are being paid (*see* Dkt. Nos. 100-132) cannot seriously be considered the kind of "termination" contemplated by L.R. 101. It is also at odds with the fact that Mr. Holahan formally sought approval for the withdrawal of Mr. Levine's co-counsel, Mr. Chandrasekhar, in November of 2018. (Dkt. No. 138). Finally, whatever such argument Mr. Levine might have had was waived by his appearance at the August 20 hearing, during which he never stated that he was no longer counsel for Chabot in this action. Mr. Levine thus should still be treated as counsel to Chabot in this case and subject to the disciplinary power of this Court for all actions taken and statements made throughout the entire proceeding, up until he is formally allowed to withdraw.

## THE STATUTE OF LIMITATIONS TO ASSESS FBAR PENALTIES

The United States would like to correct an assertion made by opposing counsel at the August 20, 2019 hearing to which undersigned counsel initially agreed. Undersigned counsel

stated that, in retrospect, Mr. Levine's efforts to drag this proceeding on for over four years was likely intended to permit Chabot to evade the statute of limitations for the assessment of penalties for his failure to file FBARs for the years under audit. (Aug. 20, 2019 Tr. 20:10-20). Mr. Levine responded that the statute of limitations to assess an FBAR penalty for 2007 had lapsed prior to the commencement of this proceeding. (*Id.* 23:8-9). When the Court asked what the statute of limitations was for an FBAR penalty, Mr. Holahan stated "I believe it's 5 years." (*Id.* 23:15). Undersigned counsel initially agreed, but suggested that there might be tolling exceptions.

Upon subsequent review of the law, the correct answer is that the deadline to assess a penalty for the failure to file an FBAR is six years from the due date of the form–June 30 of the following year. *United States v. Bussell*, Case No. CV 15-02034 SJO, 2015 WL 9957826, *6 (C.D. Cal. Dec. 8, 2015) (citing *Moore v. United States*, No. 13-cv-02063-RAJ, 2015 WL 1510007, *2 (W.D. Was. Apr. 1, 2015)). The tax years for which the IRS sought foreign financial account records were 2006-2009. The respective deadlines to file FBARs for these years were June 30, 2007, June 30, 2008, June 30, 2009, and June 30, 2010. Accordingly, the periods to assess Chabot for his failure to file these forms expired on July 1, 2013, July 1, 2014, July 1, 2015, and July 1, 2016.

This action was commenced on May 14, 2014, the Court ordered the summons enforced on October 3, 2014, and the Court of Appeals affirmed the enforcement order on July 17, 2015. (Dkt. Nos. 1, 15, and 20). On November 15, 2015, the Supreme Court denied Chabot's petition for certiorari. Thus, contrary to Mr. Levine's assertion at the August 20, 2019 hearing, the deadlines to assess FBAR penalties for 2007 had not already expired when the United States filed its petition seeking enforcement of the summons. More importantly for the purposes of any

3

disciplinary action, at the time Mr. Levine had exhausted all possible appeals of the enforcement order, the statute of limitations to assess for 2009 had not lapsed.

ELI CHABOT – FALSE STATEMENTS

The following statements by Eli Chabot appear to be false.

From the Second Supplemental Declaration of Eli Chabot (Dkt. No. 49):

- "I respectfully ask this Court not to hold me in contempt of this Court's Order dated October 3, 2014 for not providing to the IRS the documents referred to in that Order, because no such documents existed at any time during the period covered by the summons and at any time thereafter." (*Id.* ¶ 4).

- "I did not have a financial interest in a bank, securities, or other financial account in a foreign country for which the owner of record or holder of legal title is a person acting as an agent, nominee, attorney or in some other capacity on my behalf at any time during the period covered by the summons and at any time thereafter." (*Id.* ¶ 6).

- "I could not control the disposition of money, funds, or other property or exercise comparable power over any foreign financial account by communicating with the bank or other person with whom such foreign financial account is maintained, either directly or through an agent, nominee, attorney, or in some other capacity on my behalf either orally or by some other means at any time during the period covered by the Summons and at any time thereafter." (*Id.* ¶ 9).

From his testimony to the Court at the hearing held on June 16, 2016:

- In response to the question "During the relevant period, did you have an ownership share in Pelsa?"
    - "I don't know." (Tr. 42:22-24).

- In response to the question "Do you remember during the relevant period if you owned any percentage of a foreign company?"
    - "I don't remember." (Tr. 44:12-14).

- In response to the question "No, you don't remember [if you ever owned any part of Pelsa] or, no, you are sure you didn't?"
    - "I don't remember." (Tr. 50:24-51:5).

- In response to the question "To clarify, you never asked Albert [Chabot] for any help in this case regarding figuring out what your connection to Pelsa is?"
    - "I wasn't asked to, so I didn't." (Tr. 54:14-17).

- In response to the question "You say as far as you remember [there was no one that you know of who owned a foreign financial account in their name but was really holding money as your nominee].[1]  Is it possible that occurred?"
    - "No.  My answer basically is no." (Tr. 60:19-21).

- In response to the question "At any point in the relevant period, was there someone who owned a foreign financial account who had acted at your direction in transferring money in or out of the account?"
    - "As far as I remember, no." (Tr. 60:22-61:1).

- The United States finally directs the Court's attention to Chabot's answers to the Court's questions about conversations with his brother, Albert Chabot, regarding Pelsa.  In that exchange, Chabot stated "It was a casual conversation, I mentioned that name [Pelsa],

---

[1] The previous question had been "During the relevant period, was there anyone that you know of who owned a foreign financial account in their name but was really holding money as your nominee?" He answered: "As far as I remember, no." (Tr. 60:14-18).

and his response was that he had no idea, so I did not wish to ask him again." (Tr. 76:20-78:15).

From the beginning, these statements were suspect. Prior to the commencement of the case, Chabot appeared and submitted to questioning by an IRS revenue agent. When asked about Pelsa, his attorney Justin Walder indicated that he had never heard of the company before and asked Chabot if he would like to discuss it outside of the presence of the IRS agent. Chabot's response was: "No, I don't think that it's related --." (Dkt. No. 7-1, pp. 41:14-42:19). Mr. Walder nonetheless convinced Chabot to discuss it privately, after which Mr. Walder indicated that unless "there's some information you can share that could refresh somebody's memory about it," he would direct Chabot not to answer. (*Id.* pp. 42:23-43:14). The crucial point, though, is that Chabot's initial response was not that he did not know about Pelsa, but that he believed it was not related to the other businesses being discussed (his U.S.-based shoe businesses).

In light of the recent Tax Court admissions by his brothers, it now seems very likely that the above-cited statements were false, particularly those made at the hearing in 2016. Chabot's brothers, Morris and Albert, are both contesting deficiency assessments in the U.S. Tax Court. (Dkt. No. 141-1, Ex's. D and E). The tax years at issue are 2009 for Morris and 2007-2009 for Albert. Both are represented in the Tax Court by Mr. Levine.

Morris Chabot's responses to the IRS's requests for admission (*Id.*, Ex. F) contained numerous admissions of direct relevance to this proceeding:

- He admitted that in 2009, all three brothers held ownership interests in Pelsa. (RFA No. 1-3).

- He admitted that in 2009, Pelsa had bank accounts with HSBC in Switzerland. (RFA No. 4).

- He admitted that he learned of the existence of Pelsa prior to 2009. (RFA No. 6).

- He admitted that in 2009, all three brothers had an interest in certain accounts Pelsa held with HSBC. (RFA Nos. 39, 42-46, and 57-66).

- He admitted that in 2009, all three brothers had ownership interests in a Pelsa bank account with Banque Sadfie in Switzerland. (RFA Nos. 28, 30, 33, and 34).

- He admitted that in 2009, Benalton Group SA held a bank account with Banque Sadfie in Switzerland and that all three brothers had an ownership interest in Benalton or an interest in the funds it held with Banque Sadfie. (RFA Nos. 67-70, 74-75, and 80-83).

These RFA responses are signed by Mr. Levine. (*Id.*, p. 20).

Albert Chabot made similar admissions, though they are more extensive because they include tax years 2007-2008, not just 2009.

- He admitted that in 2007-2009, all three brothers had ownership interests in Pelsa. (RFA Nos. 69-77).

- He admitted that in 2007-2009, Pelsa had a financial account with HSBC in Switzerland. (RFA Nos. 147-150).

- He admitted that during the years 2007-2009, he was aware of Pelsa's financial account at HSBC in Switzerland. (RFA Nos. 160-162).

- He also admitted that Pelsa had a financial account at Banque Safdie in Switzerland during the years 2007-2009, that all three brothers had beneficial interests in this account, and that in all three years, he knew or had reason to know of this account. (RFA Nos. 176-188).

These RFA responses are signed by Mr. Levine. (*Id.*, p. 52).

Based on Eli Chabot's testimony that he was actively involved with the other brothers in their various businesses, it is extremely hard to imagine that unlike the other two, he was not aware of Pelsa and its finances. And even if his stroke impaired his memory, it is equally hard to believe that after the commencement of this case, he only had a passing discussion with Albert about the company and that Albert had "no idea" what it was. Accordingly, the above-cited statements appear to be false.

RICHARD LEVINE – ETHICAL VIOLATIONS

The following rules of professional responsibility may be implicated by Mr. Levine's behavior in this case.

Rule 3.1 of the New Jersey Rules of Professional Conduct provides[2]:

> A lawyer shall not bring or defend a proceeding, nor assert or controvert an issue therein unless the lawyer knows or reasonably believes that there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law, or the establishment of new law.

Rule 3.2 of the New Jersey Rules of Professional Conduct provides:

> A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client and shall treat with courtesy and consideration all persons involved in the legal process.

Rule 3.3(a) of the New Jersey Rules of Professional Conduct provides:

> A lawyer shall not knowingly:
>
> (1) make a false statement of material fact or law to a tribunal;
>
> (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting an illegal, criminal or fraudulent act by the client;

---

[2] Rule 11(b) of the Federal Rules of Civil proscribes similar behavior when contained in any paper presented to the court.

(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel;

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures; or

(5) fail to disclose to the tribunal a material fact knowing that the omission is reasonably certain to mislead the tribunal, except that it shall not be a breach of this rule if the disclosure is protected by a recognized privilege or is otherwise prohibited by law.[3]

Mr. Levine is subject to these rules as a result of his *pro hac vice* appearance. N.J. R.P.C. 8.5(a) and (b). As will be discussed below, many of Mr. Levine's statements and actions may have violated these rules.

## The Changing Bases of Chabot's Defense

Over the course of this case, Mr. Levine has offered conflicting factual and legal theories to oppose enforcement of the summons. While any one of them might have had merit, they cannot all have been true and were not presented as meritorious alternative arguments. Indeed, based on his brothers' admissions in Tax Court and the foreign bank records provided by Mr. Holahan to undersigned counsel, it is now clear that Mr. Levine's position from the first reopening of the case in January 2016 through disclosure of those documents in January 2019–

---

[3] The United States notes that communications between Mr. Levine and the Chabot brothers may be subject to the crime-fraud exception to the attorney-client privilege and work product doctrine. "'[U]nder federal law, the [crime-fraud] exception can encompass communications and attorney work product in furtherance of an intentional tort that undermines the adversary system itself,' including misrepresentations by omission." *Kickflip, Inc. v. Facebook, Inc.*, No. CV 12-1369-LPS, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016) (quoting *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 380 (D.N.J. 2006)) (ordering the production of emails subject to work product doctrine reflecting conversations possibly made in furtherance of a fraud on the court). *See also In re Neurontin Antitrust Litigation*, 801 F.Supp.2d 304, 311 (D.N.J. 2011). "This may include communications and work product used in furtherance of the spoliation of evidence." *Wachtel*, 239 F.R.D. at 380. If the communications are subject to the exception, then Mr. Levine would be obligated to reveal their contents if omitting them was reasonably likely to mislead this Court.

that Chabot lacked a present ability to comply with the summons–was at best misleading and at worst completely dishonest.

Mr. Walder initially opposed the petition on a Fifth Amendment privilege argument–that compliance with the summons or admission of the present inability to comply with the summons would effectively admit that Chabot failed to file FBARs and perhaps also failed to maintain required records–both of which are potential felonies. When this Court ruled against Chabot, Mr. Levine took the appeal and adopted Mr. Walder's argument regarding the Fifth Amendment privilege and the potential for self-incriminating admissions leading to FBAR-related criminal charges. (*See* Ex. A). If Chabot actually had reportable financial accounts during the years covered by the summons, this appeal might have been meritorious, and Mr. Levine could not be criticized for having prosecuted it. Having lost the appeal, Mr. Levine should have worked with Chabot to comply with the Court's order.

But when Mr. Levine lost his appeal, he chose to pursue a new defense entirely. In response to undersigned counsel's motion for contempt, Mr. Levine argued that Chabot complied by informing the IRS that he had no documents responsive to the summons because he never had a sufficient connection to any foreign financial accounts to trigger the Bank Secrecy Act's record-keeping requirement. (*See* Dkt. Nos. 28 and 32).[4] The United States challenged his right to make this argument–both because it was foreclosed by the Supreme Court's decision in *United States v. Rylander*, 460 U.S. 752 (1983), and because it defied common sense that the Chabots would fight all the way to the Supreme Court over whether the Required Records Doctrine

---

[4] Though Mr. Levine did not sign these briefs, his later advocacy for them makes him subject to sanctions based on their contents. L.R. 101(c)(6) ("Any pro hac vice counsel admitted in the action is deemed to have certified under Fed. R. Civ. P. 11(b) to those pleadings, written motions or other papers that the pro hac vice counsel signs, files, submits or later advocates to the Court.").

10

applied to FBAR-related records if the issue were purely academic in their case. (Dkt. No. 30, pp. 4-5). The Court expressed similar frustration and incredulity (Apr. 13, 2016 Tr. 7:15; Jun. 16, 2016 Tr. 17:15-16 ("It's a terrible situation. I feel like we wasted our time…")), but ultimately permitted Mr. Levine to pursue this new argument. (*Id.* 33:17-23).

Then, after another two-and-a-half years of litigation (including another trip to the Third Circuit and a failed attempt to seek Supreme Court review), Mr. Levine provided to undersigned counsel via Mr. Holahan 86 pages of bank records. (Dkt. No. 141-1). Mr. Holahan's cover letter stated that "[t]he documents are responsive to the IRS's summonses in this matter and constitute the required records under the Bank Secrecy Act sought by the Government in this pending enforcement proceeding." (*Id.*) At the subsequent hearing, the Court correctly characterized this as an admission that Eli Chabot had been required to maintain records under the BSA. (Aug. 20, 2019 Tr. 4:17-19). Mr. Holahan disagreed, apparently claiming that while Mr. Levine did not believe Chabot was subject any FBAR reporting requirement, the Court had held that Chabot was and these were the records the United States believed he was required to maintain pursuant to those regulations. (*Id.* 4:12-14, 20-5:4).

That explanation thus yet again leaves the government and this Court in limbo with no clear way to proceed. Without any factual admissions regarding the origin of the documents and why Mr. Levine believes the United States would believe the accounts they reference were subject to a reporting requirement, it is impossible to determine whether Chabot has in fact complied with the summons. Given his refusal to explain how exactly he obtained them, it seems unlikely any such admissions will be forthcoming without additional litigation. Apparently, this is yet another stall tactic.

Individually, some of Mr. Levine's positions throughout this litigation were facially plausible, but as the United States has argued since the April 2016 hearings, they are mutually inconsistent. His advancement of some of them may have violated the above-cited rules, and certainly his repeated shifting of legal theories may have violated the obligation to expedite litigation.

### Misrepresentation of the FBAR Requirements

Early in the contempt phase of this case, Mr. Levine repeatedly misrepresented the scope of the BSA's record-keeping requirement. Specifically, he incorrectly implied that it only covers foreign financial accounts: (1) held in a U.S. person's name; (2) held in the name of a business in which the U.S. person has a more than 50% ownership interest; or (3) for which the U.S. person has signature authority. For example, in his opposition to the first contempt motion, he stated that the documents submitted in support of the petition "do not show Eli Chabot has either signature authority over any Pelsa foreign bank account or more than 50% ownership in Pelsa." (Dkt. No. 28, p. 8). He repeated this depiction of the BSA's scope in his second brief in opposition to the first contempt motion, suggesting that these were the only three factors giving rise to the reporting requirement. (Dkt. No. 32, p. 7). Eli Chabot's declaration submitted with the second brief also references only these factors, further suggesting that they are the only ones that trigger the record-keeping requirement. (Dkt. No. 32-1).

But as undersigned counsel constantly tried to clarify, the reporting requirements also cover accounts for which the owner of record holds the account as an agent or nominee of the U.S. person or over which the U.S. person exercises "other authority"–the power to direct the disposition of funds in the account via direct communication with the financial institution. (*See* Dkt. No. 30, p. 2 (citing 31 C.F.R. § 1010.350(f)(1)). While Mr. Levine did not subsequently

disagree that the reporting requirements apply to nominee situations, he initially disputed that "signature or other authority" encompassed anything broader than traditional signature authority. (Dkt. No. 32, pp 8-9). In fact, he engaged in a lengthy exchange with the Court in which he repeatedly insisted that, notwithstanding basic rules of statutory interpretation, "or other" had no independent meaning. (Apr. 13, 2016 Tr. 9:16-14:5).

These representations by Mr. Levine may have violated the above-cited rules.

### False or Misleading Evidence

Mr. Levine has offered several crucial items of evidence that were either false or deliberately crafted to be misleading–the written and oral testimony of Eli Chabot, the report from Weiss & Company LLP (the "Weiss Report"), and the three letters from Patrizia Holenstein,  (Dkt. Nos. 44, 45, 51, and 52).

The United States has already identified statements by Eli Chabot that appear to be false and explained how the first declaration prepared by Mr. Levine and signed by Chabot appears to have deliberately ignored relevant factors that could have led to an FBAR record-keeping requirement.  It must be reiterated, though, that as tax counsel to all three Chabot brothers, Mr. Levine must have understood how implausible was Eli's depiction of his discussion with Albert about Pelsa.  And to the extent Eli's description was at all accurate, it was almost certainly because Mr. Levine advised the brothers against discussing the matter during this litigation.  As his co-counsel put it at the last hearing "frankly, the brothers avoided the discussions with respect to this matter because of the legal implications of it." (Aug. 20, 2019 Tr. 13:7-13).  Thus, he either knowingly permitted Chabot to lie under oath or aided Chabot in misleading both the Court and the United States as to why Chabot had not done more to comply with the summons by seeking information from his brothers (at least one of whom he saw regularly).

The Weiss Report and the Holenstein Letters were exercises in obfuscation. At the first hearing in this matter, the Court found Eli Chabot's testimony not credible in light of his oral contradiction of his prior declaration and his statements regarding his stroke. (Apr. 13, 2016 Tr. 61:25-62:15). It then directed Mr. Levine to affirmatively "undertak[e] an appropriate investigation to determine whether, indeed, there were foreign accounts, ownership in corporations, or other matters that would [give rise to a record-keeping requirement under the BSA]." (*Id.* 63:1-6). Mr. Levine responded by submitting the Weiss Report and a series of letters from Holenstein.

The Weiss Report was facially inadequate to meet the Court's order. In effect, it stated that after a review of documents supplied by Eli and Renee Chabot–comprised entirely of records from *domestic* financial institutions and their U.S. tax returns–the accounting company saw nothing to connect the Chabots to any foreign financial accounts (with the exception of a few international wire transfers to and from Eli's accounts) and no references to Pelsa. Upon cross-examination, Chabot admitted that he never met with anyone from Weiss and that no one involved in producing the Weiss Report had ever actually asked him or his wife any questions about his finances during the relevant years. (June 16, 2016 Tr. 64:11-65:16). He also admitted that he never asked Albert Chabot's assistance and he did not know if anyone else had either. (*Id.* 66:15-68:9). Since the summons sought records of *foreign* financial accounts that were not disclosed on Chabot's U.S. returns, the self-imposed scope of the Weiss Report seems to have been deliberately designed *not* to find the information the Court ordered Mr. Levine to seek. Its submission thus appears intended solely to mislead the Court or simply to delay the proceeding.

According to the first Holenstein Letter, Ms. Holenstein sent letters to HSBC on behalf of Eli and Renee Chabot asking for information on accounts for which they were the account

holders or had signature authority. (Dkt. No. 45, p. 1). When she did not receive a response after a little more than two weeks, she concluded that neither of them held accounts at the bank or had "signatory or other rights and/or authority over any account with HSBC Private Bank (Suisse) SA." (*Id.*). She went on to opine that even if they were beneficial holders of accounts there, Swiss banking laws would prohibit HSBC from providing any information to them absent the consent of the account holder of record. (*Id.* p. 2). The second Holenstein Letter noted that an additional two-and-a-half weeks had gone by with no response and again opined that this was evidence that the Chabots held no accounts there. (Dkt. No. 51).

The service Mr. Levine retained Ms. Holenstein to perform was just as deliberately futile as with Weiss & Company. From the outset of this proceeding, the most likely explanation of the HSBC document submitted by the IRS along with the petition was that the Chabot brothers indirectly maintained foreign financial accounts by using Pelsa as their nominee and with someone else having signature authority (perhaps the person listed on the document as Pelsa's attorney). If Holenstein was correct about Swiss banking law, then asking HSBC for accounts for which Eli was the account holder was almost guaranteed *not* to yield a response related to Pelsa's account. Asking for accounts for which he had signature authority also would not be productive in the likely event that the entire arrangement was structured to hide his connection to the accounts. More importantly, though, and as Mr. Levine effectively admitted at the last hearing, when it was in Albert Chabot's interest to procure Pelsa's financial records at HSBC, Mr. Levine found another Swiss lawyer who got them and thereby showed that Ms. Holenstein's representations were either wrong or incomplete at best. (Aug. 20, 2019 Tr. 11:6-12:25).[5] Like

---

[5] Mr. Levine further implied that Ms. Holenstein might not have been able to secure the records because approval from Albert was necessary and Albert did not want to give permission at the

the Weiss Report, the Holenstein Letters appear to have constituted false or materially misleading evidence designed to create the illusion that Mr. Levine had conducted the good-faith, affirmative investigation he was ordered to conduct.

Both individually and taken together, Mr. Levine's presentment of these items of evidence may have violated the above-cited ethical rules, including the obligation to expedite litigation.

### Frivolous Motions to Compel Production

Early in the case, Mr. Levine filed a motion to compel the United States to produce all documents it had: (1) suggesting Eli and Renee Chabot had an interest in a foreign bank account; or (2) relating to Pelsa. (Dkt. No. 28-2). The United States opposed, arguing that any such documents were unnecessary for the Chabots' *present inability* defense and that granting the motion would improperly shift the evidentiary burden to the Government. (Dkt. No. 30, p. 6-7). The Court denied the motion prior to oral argument. (Dkt. No. 31).

Mr. Levine renewed his motion in his second brief in opposition to the contempt motion and again at the first contempt hearing. (Dkt. No. 32; pp. 11-12; Apr. 14, 2016 Tr. 30:2-31:3). The United States opposed based on the same arguments. (*Id.* 31:4-22). The Court denied the renewed motion on the same grounds as before. (*Id.* 32:4-33:4).

There was no legitimate reason for these motions. As undersigned counsel indicated at the most recent hearing, the real purpose was likely to determine what bank accounts the IRS already knew about, in order to facilitate Eli and his brothers' selective disclosure of information in this case and in their future Tax Court cases. (Aug. 20, 2019 Tr. 16:19-23). His

---

time. (*Id*. 12:4-21). If that was actually why Ms. Holenstein could not procure them, the omission of this reason from Mr. Levine's representations to the Court made those statements extremely misleading.

16

representations in support of the motions thus may have violated the above-cited ethical rules, including the failure to expedite litigation.

_____

WHEREFORE THE UNITED STATES OF AMERICA RESPECTFULLY REQUESTS that the Court take whatever action it deems necessary to vindicate its authority and to enforce all applicable laws and regulations governing the legal and ethical obligations of attorneys practicing in New Jersey.[6]

Date:  October 18, 2019                            Respectfully submitted,

                                                   RICHARD E. ZUCKERMAN
                                                   Principal Deputy Assistant Attorney General

                                                   /s/ Ward W. Benson
                                                   WARD W. BENSON
                                                   Trial Attorney, Tax Division
                                                   U.S. Department of Justice
                                                   Post Office Box 227
                                                   Ben Franklin Station
                                                   Washington, D.C. 20044
                                                   Telephone: 202-514-9642
                                                   Email: ward.w.benson@usdoj.gov

---

[6] 28 U.S.C.A. § 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  If the Court believes sanctions under this provision are appropriate, the United States can submit a calculation of its attorneys' fees incurred in this matter and a bill of costs.

17

## **CERTIFICATE OF SERVICE**

I certify that the foregoing BRIEF was filed with the clerk of the court on October 18, 2019, using the CM/ECF system, which will send notification of such filing to all parties appearing in said system.

/s/ Ward W. Benson
WARD W. BENSON
